United States District Court
For the Northern District of California

**NOT FOR PUBLICATION**

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: TALEO CORPORATION SECURITIES LITIGATION | No. C 09-00151 JSW<br><br>**ORDER GRANTING MOTION TO DISMISS AMENDED CLASS ACTION COMPLAINT WITH LEAVE TO AMEND** |

## INTRODUCTION

Now before the Court for consideration is the Motion to Dismiss filed by Defendants Taleo Corporation ("Taleo"), Michael Gregoire ("Gregoire"), Katy Murray ("Murray"), and Divesh Sisodraker ("Sisodraker") (collectively "Defendants"). Having considered the parties' papers, relevant legal authority, and the record in this case, the Court HEREBY GRANTS Defendants' motion and GRANTS Plaintiff leave to amend.

## BACKGROUND

**A.    Procedural History.**

On January 13, 2009, Scott Stemper and Molly Martin filed the original complaint in this action. (Docket No. 1.) On January 22, 2009, Greater Pennsylvania Carpenters' Pension Fund filed a motion to be appointed Lead Plaintiff.[1] (Docket No. 8.) The motion was not opposed and, on February 9, 2009, the Court granted the motion. (Docket No. 14.) On June 15, 2009, Plaintiff filed the Amended Class Action Complaint ("FAC").

---

[1]     Hereinafter, the Court shall refer to the Greater Pennsylvania Carpenters' Pension Fund as "Plaintiff."

**B.      Factual Background.[2]**

    **1.      The Parties.**

        **a.      Lead Plaintiff Greater Pennsylvania Carpenters' Pension Fund.**

Plaintiff is a pension fund that provides retirement benefits for its approximately 15,000 members. (FAC ¶ 15.) Plaintiff alleges that between July 19, 2007 and September 11, 2008, it purchased shares of Taleo stock at artificially inflated prices and suffered damages as a result. (*Id.* ¶ 15, Ex. A.) Plaintiff seeks to represent a class of Taleo shareholders who purchased or otherwise acquired Taleo Class A common stock between September 29, 2005 and November 12, 2008 (the "Class Period"). (*Id.* ¶¶ 1, 21.)

        **b.      Defendant Taleo.**

Taleo was founded in 1998 and provides two suites of talent management software solutions, Taleo Enterprise Edition and Taleo Business Edition, which it delivers to its customers "on-demand as a hosted service that is accessed through the internet." (*Id.* ¶¶ 16, 27-28.) Taleo went public on September 29, 2005, and Taleo Class A common stock has traded actively on the NASDAQ since that time. (*Id.* ¶¶ 2, 16, 27.)

        **c.      The Individual Defendants.**

Gregoire has served as Taleo's President and Chief Executive Officer ("CEO") since March 2005, as a Taleo director since April 2005, and as Taleo's Chairman of the Board of Directors since May 2008. (*Id.* ¶ 17.) During the Class Period, Gregoire signed Taleo's Form 10-K Annual Reports, and accompanying certifications made pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"). Gregoire also signed Taleo's Form 10-Q Quarterly Reports for the third quarter of fiscal year 2005 through the second quarter of fiscal year 2008, the accompanying SOX certifications, and Management's Report on Internal Control Over Financial Reporting contained in the Form 10-Ks filed in 2006 and 2007.[3] (*See generally* FAC ¶¶ 66-69, 75-76, 81-89, 106-119.) During the Class Period, Gregoire also made statements during conference calls

---

[2]     The following facts are drawn from the FAC and documents of which the Court may take judicial notice. *See* Section C, *infra*.

[3]     Hereinafter, the Court shall abbreviate fiscal years and quarters as, "Q3 2005."

2

1 and press releases regarding his "confidence" that Taleo's financial statements were accurate,
2 his knowledge of the software Taleo used for revenue recognition purposes, his knowledge of
3 efforts Taleo made to improve its internal controls over financial reporting, and his knowledge
4 of Taleo's financial performance. (*See, e.g., id.* ¶¶ 70, 73, 77, 80, 98, 99, 122-123, 168.)
5 Plaintiff alleges that while he was in possession of non-public material information, Gregoire
6 sold 250,000 shares of Taleo stock, which generated proceeds of $6,625,000 and which
7 represented 42% of the approximately 595,000 shares he possessed or acquired during the Class
8 Period. (*Id.* ¶¶ 227, 229.)

9 Murray has served as Taleo's Executive Vice President and Chief Financial Officer
10 ("CFO") since September 2006, is responsible for Taleo's financial operations, and reports
11 directly to Gregoire. (*Id.* ¶ 18.) According to Plaintiff, Murray "joined Taleo ... as part of the
12 plan to restructure the accounting department, which was supposed to add technically
13 competent accounting personnel to Taleo's staff." (*Id.* ¶¶ 217, 223.) Murray is a Certified
14 Public Accountant and previously served as CFO for other technology companies providing
15 software and technology services. (*Id.*) Murray signed Form 10-K Annual Reports for 2006
16 and 2007, Form 10-Qs for Q3 2006 through Q2 2008, the accompanying SOX certifications,
17 and Management's Report on Internal Control Over Financial Reporting contained in the Form
18 10-Ks for 2006 and 2007. (*See generally* FAC ¶¶ 81-89, 155, 160, 162.) During the Class
19 Period, Murray also made statements during conference calls about Taleo's efforts to improve
20 its revenue recognition procedures and Taleo's financial performance. (*See, e.g., id.* ¶¶ 94, 153-
21 154, 166, 168, 224-225.)

22 Plaintiff alleges that between September 2006 and November 11, 2008, while in
23 possession of non-public information, Murray sold 60,236 shares of Taleo stock, which resulted
24 in gross proceeds of $1,164,019, that she sold 40% of the approximately 151,000 shares she had
25 available for sale during the Class Period, and that all of her sales "occurred within
26 approximately one year of Taleo['s] announcement of its possible restatement due to revenue
27 recognition issues." (*Id.* ¶ 228.) Plaintiff alleges that Murray sold 9,687 shares, resulting in
28

3

1  gross proceeds of $209,502, within three months of a press release in which Taleo revealed
2  possible revenue recognition issues. (*Id.*)

3  Sisodraker served as Taleo's Executive Vice President, CFO, and Secretary from
4  September 2005 through September 2006. (*Id.* ¶ 19.) Sisodraker is a Chartered Accountant,
5  which is the Canadian equivalent of a CPA in the United States. (*Id.*) Sisodraker signed
6  Taleo's Form 10-K Annual Report for 2005 and Form 10-Qs for Q3 2005 through Q2 2006, and
7  the accompanying SOX certifications for those reports. (*See generally* FAC ¶¶ 66-69, 75-76,
8  106-119.) During the Class Period, Sisodraker made statements during conference calls and in
9  press releases regarding Taleo's efforts to eliminate material weaknesses in financial reporting,
10 his knowledge of Taleo's revenue recognition systems, and Taleo's financial performance.
11 (*See, e.g., id.* ¶¶ 71-72, 74, 78, 98, 124, 222.)

### 2. The Alleged Scheme to Defraud.

13 Plaintiff contends that after Taleo went public in 2005, Defendants "quickly realized that
14 the ability to deliver revenue growth and, therefore, earnings was key to driving Taleo's stock
15 price," *i.e.* revenue was a "key financial metric" used to evaluate Taleo's financial performance.
16 (*Id.* ¶¶ 2, 31-32.) "Taleo management devised a scheme to make it appear that Taleo was
17 consistently delivering revenue at levels that exceeded analysts [*sic*] expectations when, in fact,
18 the opposite was true." (*Id.* ¶¶ 2, 33.) If Taleo exceeded revenue estimates, Taleo also would
19 exceed analysts' estimates on earnings-per-share ("EPS"). (*Id.* ¶ 33.) When Taleo did not meet
20 analysts' expectations on EPS, even if it exceeded expectations on reported revenue, its stock
21 price dropped. (*Id.* ¶¶ 3, 34.) Plaintiff alleges that Defendants took notice of that correlation
22 and "[a]fter the first quarter of 2006, Taleo never again in the Class Period reported quarterly
23 revenue or earnings that fell short of consensus estimates." (*Id.*, ¶¶ 3, 34-35.) Plaintiff's theory
24 is that Defendants recognized revenue before it was earned, in order to drive up Taleo's stock
25 price. (FAC ¶¶ 1, 42-43.)[4]

---

[4] In paragraphs 96-211, Plaintiff sets forth its allegations of false and misleading statements regarding Taleo's financial performance that are attributed either to Taleo generally or to one or more of the individual defendants. This section of the FAC focuses on Plaintiff's allegations that Taleo's financial statements during the Class Period

4

Taleo has two primary sources of revenue: application revenue and consulting revenue. Application revenue is derived from fixed fee contracts where fees generally are paid over the term of the contract. (*Id.* ¶ 29.) Consulting revenue is derived from fees charged to Taleo customers that are for services separate from, but related to, the customer's ability to access Taleo's software applications. (*Id.* ¶ 30.) In general, Taleo's customers purchase applications and consulting services in a single "bundled" revenue arrangement. "In other words, at the time a customer purchases the right to use Taleo's software applications for a fixed time period or term, the contract will generally include the right to access Taleo's software applications for that term [and] various services offered by Taleo such as set-up and training. These services are provided at or close to the inception of the contract." (*Id.*)

A fundamental principle of Generally Accepted Accounting Principles ("GAAP") is that revenue should not be recognized before it is earned. (FAC ¶ 41.) Under GAAP, accounting and revenue recognition for Taleo's bundled contracts were governed by Emerging Issues Task Force Abstract Issue No. 00-21, "Revenue Arrangements with Multiple Deliverables" ("EITF 00-21"). (*Id.* ¶ 43-48; *see also* Declaration of Cheryl W. Foung In Support of Motion to Dismiss ("Foung Decl."), Ex. 19 ("EITF 00-21").)

EITF 00-21 provides, in pertinent part, that

In an arrangement with multiple deliverables, the delivered item(s) should be considered a separate unit of accounting if all of the following criteria are met:

a. The delivered item(s) has value to the customer on a standalone basis. That item(s) has value on a standalone basis if it is sold separately by any vendor or the customer could resell the delivered item(s) on a standalone basis. In the context of a customer's ability to resell the delivered item(s), the Task Force observed that this criterion does not require the existence of an observable market for that deliverable(s).

b. There is objective and reliable evidence of the fair value of the undelivered item(s).

c. If the arrangement includes a general right of return relative to the delivered item, delivery or performance of the undelivered item(s) is considered probable and substantially in control of the vendor.

---

were materially false and misleading because Defendants failed to disclose that Taleo's "record revenues" were achieved through improper revenue recognition. (*See, e.g.,* FAC ¶¶ 105, 125, 145, 159.)

5

1  (EITF 00-21, ¶ 9; *see also* FAC ¶ 46.) If these criteria are not met, the multiple items are to be
2  combined and treated as a single unit of accounting. (FAC ¶ 47; EITF 00-21 ¶ 10.)
3        According to Plaintiff, in order to apply EITF 00-21 properly, Taleo was required to
4  "answer two, straightforward, yes or no questions:" (1) did application and consulting services
5  have stand alone value to the customer; and (2) did Taleo have objective and reliable evidence
6  of the fair value of its application and consulting services? (*Id.* ¶ 45.) If the answer to either of
7  those questions was no, Taleo was required to recognize consulting and application revenue
8  together, ratably, over the life of the contract. (*Id.*) However, Taleo historically treated
9  consulting revenue and application revenue as separate units of accounting, *i.e.* "when
10 application services and consulting services were sold together, [Taleo] recognized consulting
11 services revenue as the services were delivered," rather than ratably over the life of the contract.
12 (FAC ¶¶ 4, 48; Foung Decl., Ex. 8 (April 30, 2009 Form 10-K at 4).)
13       In November 10, 2008, Taleo issued a press release and disclosed that its auditors had
14 requested a re-evaluation of its historical application of EITF 00-21. (FAC ¶ 4; Foung Decl.
15 Ex. 14 (Nov. 10, 2008 Press Release); April 30, 2009 Form 10-K at 3.) In that press release,
16 Gregoire stated that the request was a "timing issue, and does not impact the total amount of
17 revenue Taleo has under contract." (Nov. 10, 2008 Press Release at 1.) Murray stated that the
18 questions raised were "(1) whether our policy that delivery of our software solutions has
19 occurred when access to the software is provided to the customer is correct, and (2) whether our
20 policy that our consulting services have standalone value is correct."
21       Murray stated that historically Taleo "has taken the position that delivery of its software
22 solutions occurs on the initial access date to the software solution, which is the point in time
23 that a customer is provided access to the on-demand application suite." She also stated that
24 when application and consulting services were sold together, "Taleo has taken the position that
25 its time and materials consulting services have standalone value and fair value and, thus, it is
26 appropriate to recognize revenue for these services as the services are performed." (*Id.*)
27 Murray also reiterated that these issues impacted timing and not the amount of revenue. (*Id.* at
28 1-2.)

6

On November 11, 2008, Taleo's share price closed down $3.22 from the prior day, which represented a 29% decline in its stock price. (*Id.* ¶ 5.)

As a result of the re-evaluation, Taleo changed its accounting practices. On April 30, 2009, Taleo issued restated financial statements for fiscal years 2003 through 2007, as well as the financial statements for Q1 2008 and Q2 2008, in order to correct the timing of revenue recognition for consulting services (the "Restatement"). (FAC ¶¶ 5-8, 51; April 30, 2009 Form 10-K at 3, 18.) In the Restatement, Defendants stated that going forward, when Taleo provided application and consulting services in a bundled arrangement, "our consulting services revenue will be recognized ratably over the term of the application services agreement, typically three years." (April 30, 2009 Form 10-K at 4.) Defendants also stated that Taleo's

> consulting services have standalone value because those services are sold separately by other vendors and we have objective and reliable evidence of fair value for consulting services based on the consistency when sold separately. Our application services have standalone value because we often sell such services separately; however, in multiple element arrangements that include both application and consulting services, *we typically do not have objective and reliable evidence of fair value for our application services*. As such, we treat multiple element arrangements that include both application and consulting services as a single unit of accounting and recognize the combined revenue over the subscription term.

(April 30, 2009 Form 10-K at 40 (emphasis added).) Taleo deferred approximately $18 million in consulting revenue to future periods. (*See* FAC ¶¶ 1, 53; April 30, 2009 Form 10-K at 4.)

Plaintiff alleges that Defendants "disseminated materially false and misleading statements concerning Taleo's revenue and earnings thereby artificially inflating Taleo's stock price. (*See* FAC ¶¶ 1, 31-58, 96-211.) Plaintiff also alleges that Defendants either falsely asserted that its internal controls over financial reporting were effective or failed to disclose material weaknesses in internal controls regarding revenue recognition practices when application and consulting services were sold together. (*See, e.g., id.* ¶¶ 59-89.) Based on these allegations, Plaintiff alleges Defendants violated Section 10(b) of the Securities Exchange Act, SEC Rule 10b-5, and Section 20(a) of the Securities Exchange Act.

## ANALYSIS

**A.  Motion to Dismiss for Failure to State a Claim.**

7

A motion to dismiss is proper under Federal Rule of Civil Procedure 12(b)(6) where the pleadings fail to state a claim upon which relief can be granted. The complaint is construed in the light most favorable to the non-moving party and all material allegations in the complaint are taken to be true. *Sanders v. Kennedy,* 794 F.2d 478, 481 (9th Cir. 1986). Rule 8(a) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief." Accordingly, motions to dismiss for failure to state a claim pursuant to Rule 12(b)(6) are typically disfavored; complaints are construed liberally to set forth some basis for relief, as long as they provide basic notice to the defendants of the charges against them. *In re McKesson HBOC, Inc. Sec. Litig.*, 126 F. Supp. 1248, 1257 (N.D. Cal. 2000). Where a plaintiff alleges fraud, however, Rule 9(b) requires the plaintiff to state with particularity the circumstances constituting fraud. *In re GlenFed, Inc. Sec. Litig.*, 42 F.3d 1541, 1547-49 (9th Cir. 1994).

Even under the liberal pleading standard of Rule 8(a), "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corporation v. Twombly*, 550 U.S. 544, 555 (2007) (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). Pursuant to *Twombly*, a plaintiff must not merely allege conduct that is conceivable but must instead allege "enough facts to state a claim to relief that is plausible on its face." *Id.* at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, __ U.S. __, 129 S. Ct. 1937, 1949 (2009) (citing *Twombly*, 550 U.S. at 556). "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully. ... When a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Id.* (quoting *Twombly*, 550 U.S. at 556-57) (internal quotation marks omitted). The Court may consider the facts alleged in the complaint, documents attached to the complaint, documents relied upon but not attached to the complaint when the authenticity of those documents is not questioned, and other matters of which the

8

1  Court may take judicial notice. *Zucco Partners LLC v. Digimarc Corp.*, 552 F.3d 981, 990 (9th
2  Cir. 2009).

3  In the securities context, the pleading requirements are even more stringent.

**B.  Private Securities Litigation Reform Act ("PSLRA").**

To plead a claim under section 10(b) and Rule 10b-5, a plaintiff must allege (1) a misrepresentation or omission, (2) of material fact, (3) made with scienter, (4) on which the plaintiff justifiably relied, (5) that proximately caused the alleged loss. *Siracusano v. Matrixx Initiatives, Inc.*, 585 F.3d 1167, 1177 (9th Cir. Oct. 28, 2009); *Zucco Partners*, 552 F.3d at 990. "At the pleading stage, a complaint stating claims under section 10(b) and Rule 10b-5 must satisfy the dual pleading requirements of ... Rule 9(b) and the PSLRA." *Zucco Partners*, 552 F.3d at 990. Thus, the PSLRA requires that "a complaint plead with particularity both falsity and scienter." *Id.* (internal quotations omitted). Where a plaintiff asserts a Section 20(a) claim based on an underlying violation of section 10(b), the pleading requirements for both violations are the same. *See In re Ramp Networks, Inc. Sec. Lit.*, 201 F. Supp. 2d 1051, 1063 (N.D. Cal. 2002).

In order to adequately plead scienter, the PSLRA requires that the plaintiff "'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" *Zucco Partners*, 552 F.3d at 991 (quoting 15 U.S.C. § 78u-4(b)(2)). "To adequately demonstrate that the 'defendant acted with the required state of mind,' a complaint must 'allege that the defendants made false or misleading statements either intentionally or with deliberate recklessness.'" *Id.* (quoting *In re Daou Sys., Inc.*, 411 F.3d 1006, 1014-15 (9th Cir. 2005)). "[D]eliberate recklessness" requires a plaintiff to plead facts demonstrating "a highly unreasonable omission, involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents of danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Id.* (internal quotations and citations omitted).

The Ninth Circuit recently clarified that a court should "conduct a dual inquiry," when it evaluates scienter. *Id.* at 991-92. First, a court should determine "whether any of the plaintiff's

1  allegations, standing alone are sufficient to create a strong inference of scienter." *Id.* at 992.
2  Second, "if no individual allegations are sufficient," a court should "conduct a 'holistic' review
3  of the same allegations to determine whether the individual allegations combine to create a
4  strong inference of intentional conduct or deliberate recklessness." *Id.*; *accord Siracusano*, 585
5  F.3d at 1180.

6  "'[I]n determining whether the pleaded facts give rise to a strong inference of scienter,
7  the court must take into account plausible opposing inferences.'" *Zucco Partners*, 552 F.3d at
8  992 (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 310 (2007)). A
9  plaintiff sufficiently alleges scienter "only if a reasonable person would deem the inference of
10 scienter cogent and at least as compelling as any opposing inference one could draw from the
11 facts alleged." *Tellabs*, 551 U.S. at 324. The inquiry "is inherently comparative." *Id.* "A court
12 must compare the malicious and innocent inferences cognizable from the facts pled in the
13 complaint, and only allow the complaint to survive a motion to dismiss if the malicious
14 inference is at least as compelling as any opposing innocent inference." *Zucco Partners*, 552
15 F.3d 991 (citing *Tellabs*, 551 U.S. at 324). If the allegations are insufficient to state a claim, a
16 court should grant leave to amend, "unless it is clear that the complaint could not be saved by
17 any amendment." *Id.* at 989 (quoting *Livid Holdings, Ltd. v. Solomon Smith Barney, Inc.*, 416
18 F.3d 940, 946 (9th Cir. 2005)).

19 **C.   Request for Judicial Notice.**

20 Federal Rule of Evidence 201 authorizes a court to take judicial notice of facts "capable
21 of accurate and ready determination by resort to sources whose accuracy can not reasonably be
22 questioned." Defendants ask the Court to take judicial notice of excerpts from documents Taleo
23 filed with the Securities and Exchange Commission ("SEC"), transcripts of Taleo Conference
24 calls, Taleo press releases, and EITF 00-21. Many of these documents are explicitly referred to
25 in the FAC. The incorporation by reference doctrine permits a court to consider documents
26 alleged in a complaint and whose authenticity no party questions, but that are not physically
27 attached to a complaint. *Branch v. Tunnell*, 14 F.3d 449, 454 (9th Cir. 1994). Those documents
28 that are not explicitly referenced in the FAC have been filed publicly with the SEC. Plaintiff

does not challenge the authenticity of the documents. Accordingly, Defendants' request to take judicial notice of Exhibits 1-9 and Exhibits 13-19 to the Foung Declaration is GRANTED.

Defendants also ask the Court to take judicial notice of documents that are not referenced in the FAC, but which Plaintiff necessarily relies upon, specifically SEC Forms 3 and 4, and a chart referencing Taleo's stock price during the Class Period. Plaintiff has not challenged the authenticity of these documents. Accordingly, the Defendants' request to take judicial notice of Exhibits 10-12 and Exhibit 23 to the Foung Declaration is GRANTED.

Defendants also ask the Court to take judicial notice of a copy of EITF Abstract for Issue 08-1, Revenue Arrangements with Multiple Deliverables; Accounting Principles Board Opinion No. 20, Accounting Changes; excerpts from the U.S. GAO, Financial Restatements: Update of Public Company Trends, Market Impacts, and Regulatory Enforcement Activities, dated March 5, 2007; and an Order issued in *In re Veritas Software Corp. v. Securities Litigation*, No. C-03-0283 MMC, slip. op. (N.D. Cal. Dec. 10, 2003). The Court did not find it necessary to refer to these documents to resolve the motion. Accordingly, Defendant's request to take judicial notice of Exhibits 20-22 and Exhibit 24 to the Foung Declaration is DENIED AS MOOT.

**D.  Plaintiff Has Not Alleged Facts Sufficient to Show a Strong Inference of Scienter.**

Defendants' motion is based only on the argument that Plaintiff has not alleged facts that raise a strong inference of scienter. Plaintiff argues that they have alleged scienter based on the following allegations: (1) the accounting fraud centered on Taleo's core operations; (2) the GAAP violations were significant; (3) the magnitude of the Restatement; (4) Taleo's history of material weaknesses in its internal controls; and (5) Gregoire and Murray engaged in suspicious stock sales.

**1.  The Core Operations Theory and The Nature of the GAAP Violations.**

"Violations of GAAP standards can ... provide evidence of scienter," as long as they are pled with particularity. *In re Daou Systems*, 411 F.3d at 1016, 1022; *see also In re McKesson*, 126 F. Supp. 2d at 1273. However, "'the mere publication of inaccurate accounting figures, or a failure to follow GAAP, without more, does not establish scienter.'" *DSAM Global Value*

11

*Fund v. Altris Software, Inc.*, 288 F.3d 385, 390 (9th Cir. 2002) (quoting *In re Software Toolworks, Inc.*, 50 F.3d 615, 627 (9th Cir. 1994)).

Defendants acknowledge that the Restatement was necessary, in part, because they had not interpreted EITF 00-21 correctly to determine "the proper accounting treatment when application and consulting services are sold together." (April 30, 2009 Form 10-K at 19.) Plaintiff cannot rely on that fact alone to establish scienter and must allege facts to show that "the defendants knew specific facts at the time that rendered their accounting determinations fraudulent." *In re Cadence Design Systems, Inc. Sec. Litig.*, 654 F. Supp. 2d 1037, 1046 (N.D. Cal. 2009) (internal quotations and citation omitted) ("*In re Cadence*"); *see also In re Connetics Corp. Sec. Litig.*, 542 F. Supp. 2d 996, 1011 (N.D. Cal. 2008) (same).

Plaintiff relies in part on the "core operations" theory to support its allegations of scienter. Under this theory, "allegations regarding management's role in a company may be relevant and help to satisfy the PSLRA scienter requirement in three circumstances." *South Ferry LP, #2 v. Killinger*, 542 F.3d 776, 785 (9th Cir. 2008) (hereinafter "*South Ferry I*"). Those three circumstances are: (1) where defendants have actual knowledge of the disputed information; (2) where it would be absurd to conclude that defendants did not have knowledge of the disputed information; (3) and where "core operations" allegations taken together with other allegations raise a cogent and compelling inference of scienter. *Id.*; *see also South Ferry LP, #2 v. Killinger*, __ F. Supp. 2d __, 2009 WL 3153067 at *5-*6 (W.D. Wash. Oct. 1, 2009) (hereinafter "*South Ferry II*").[5]

A plaintiff may satisfy the "actual knowledge" analysis when the complaint includes "detailed and specific allegations about management's exposure to factual information within the company." *South Ferry I*, 542 F.3d at 785; *see also In re Daou Systems*, 411 F.3d at 1022 ("specific admissions from top executives that they are involved in every detail of the company and that they monitored portions of the company's database, are factors in favor of inferring scienter in light of improper accounting reports") (citing *Nursing Home Pension Fund, Local*

---

[5] This Court adopts the terminology used by Judge Coughenour in *South Ferry II* and refers to these three circumstances as "the 'actual knowledge' analysis, the 'absurdity' analysis, and the 'holistic' analysis." *South Ferry II*, 2009 WL 3153067 at *5.

12

*144 v. Oracle Corp.*, 380 F.3d 1226, 1234 (9th Cir. 2004)). In contrast, "[g]eneral allegations of defendants' 'hands-on' management style, their interaction with other officers and employees, their attendance at monthly meetings, and their receipt of unspecified weekly or monthly reports," are not sufficient to establish scienter. *In re Daou Systems*, 411 F.3d at 1022 (citing *In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1087 (9th Cir. 2002)).

      The Court must determine whether Plaintiff has alleged facts to show that Defendants had knowledge of the "disputed information," *i.e.*, that Defendants knew they should have recognized accounting and consulting services as a single unit of accounting, rather than separate units, when those services were bundled. By way of example, Plaintiff alleges that during a conference call held on February 17, 2007, Murray stated that she "focus[ed] on the finance and accounting function of Taleo's business." (FAC ¶ 218.) Gregoire made statements to the effect that Taleo "progressed in every [financial] metric we tracked," and that "we have our fingers closely on the pulse of the operations of this company." (*See* FAC ¶¶ 216, 220.) Sisodraker stated that he knew what accounting software Taleo used, and he discussed efforts Taleo made to improve internal financial operations. (FAC ¶¶ 72, 74.)

      In *In re Cadence*, plaintiffs alleged that Cadence improperly accounted for two major transactions based on the manner in which it classified two licenses, which impacted whether Cadence could recognize revenue on those licenses up-front or ratably. It was undisputed that Cadence did classify the two licenses incorrectly, and the plaintiffs claimed that the individual defendants did so deliberately. *In re Cadence*, 654 F.3d at 1040-43. The plaintiffs relied, in part, on statements that the individual defendants "'spent time' with customers and the individual defendants' general roles in the approval process for Cadence transactions. *Id.* at 1047-49. The court, however, concluded that those facts did not support a strong inference of scienter, because none of the statements demonstrated that the defendants "were likely to know first hand the facts that were key to" properly classifying the licenses. *Id.* at 1046-48.

      In contrast, in *South Ferry II*, the court concluded that plaintiffs had alleged sufficient facts to satisfy the "actual knowledge" analysis. In that case, the plaintiffs' claims were premised upon allegations that the defendants made misrepresentations regarding the

13

company's risk management capabilities and were supported by statements from the individual defendants that demonstrated they had direct access to the information on which the statements were based. *South Ferry II*, 2009 WL 3153067 at *9-*12.

Here, the statements cited above demonstrate that Murray and Sisodraker had a general knowledge of Taleo's accounting procedures. Gregoire's statements are even more generalized, but do suggest that he had information regarding Taleo's financial performance. However, as in *In re Cadence*, and in contrast to *South Ferry II*, none of these statements suggest that Defendants "were likely to know first hand the facts that were key" to properly applying EITF 00-21 when consulting services and application services were sold as a bundle. *Cf. City of Brockton Retirement System v. Shaw Group, Inc.*, 540 F. Supp. 2d 464, 473-74 (S.D.N.Y. 2008) (emphasis added) (finding that plaintiffs failed to allege scienter where they did not allege facts demonstrating that defendants "were furnished with information that would have allowed them to discern that the financial data *was wrong*") (emphasis added). As discussed in more detail below, the Court also finds that this case involves application of a GAAP principle that appears to require some exercise of judgment, which further distinguishes *South Ferry II*. Thus, the Court concludes that the "actual knowledge" analysis of the "core operations" theory does not assist Plaintiff in establishing scienter. The Court shall, however, consider the core operations allegations in its "holistic" evaluation of the FAC.[6]

With respect to the "significance" of the GAAP violations, it is undisputed that the Restatement covered fiscal years 2003 through 2007, as well as the first two quarters of 2008. Plaintiff acknowledges, however, that Defendants historically, and consistently, interpreted EITF 00-21 to treat consulting services and application services as separate units of accounting, when sold as a bundle, until its outside auditors requested that Taleo re-evaluate this practice in 2008. (*See* FAC ¶¶ 4, 231; Nov. 10, 2008 Press Release at 1.)

---

[6] The Court concludes that the facts alleged do not demonstrate that this case is similar to *Berson v. Applied Signal Technology, Inc.*, 527 F.3d 982 (9th Cir. 2008) such that it could be placed into "the exceedingly rare category of cases in which the core operations inference, without more, is sufficient" to establish scienter under the PLSRA. *South Ferry II*, 542 F.3d at 785 n.3; *see also id.* at 786 (noting that absurdity analysis will apply in "rare circumstances").

14

Plaintiff relies heavily on *Stocke v. Shuffle Master, Inc.*, 615 F. Supp. 2d 1180 (D. Nev. 2009). However, in that case, the defendants improperly accounted for revenue approximately one year after they had acknowledged and disclosed a similar error. *Stocke*, 615 F. Supp. 2d at 1188-89. The court concluded the "similar circumstances" surrounding the two transactions, as well as the magnitude of the impact on the defendants' revenue, contributed to the overall inference of scienter. *Id.* at 1190. In contrast, in this case Defendants had practiced the disputed method of revenue recognition since at least 2005 and publicly disclosed their methods in SEC filings, yet during that time there was no indication that Defendants' application of EITF 00-21 was erroneous. That fact distinguishes this case from the *Stocke* case. Indeed, the fact that Defendants applied EITF 00-21 in such a consistent and transparent manner raises a plausible inference that Defendants' error was innocent. *See, e.g., In re WatchGuard Sec. Litig.*, 2006 WL 2038656 at *5-*6 (W.D. Wash. Apr. 21, 2006) (finding that allegations did not support a strong inference of scienter where, *inter alia*, defendants had "consistently disclosed" accounting error on which restatement was based and where "blatant error had been committed in each quarter in open and notorious fashion for years").

Plaintiff also contends that application of EITF 00-21 is simple and straightforward, but it fails to support that allegation with any facts. For example, although Plaintiff alleges that Murray was a CPA and that Sisodraker was a Chartered Accountant, Plaintiff does not allege facts to suggest that, by virtue of their professional status or their prior experience, Murray and Sisodraker would have known, or should have known, that Taleo was not applying EITF 00-21 properly. *Compare In re IMAX Sec. Litig.*, 587 F. Supp. 2d 471, 483 (S.D.N.Y. 2008) (finding that plaintiffs had sufficiently alleged scienter where plaintiffs set forth facts demonstrating, *inter alia*, defendants' "understanding of the relevant accounting rules, ... the ramifications of selecting certain interpretations of the rules over others," and an "increasingly aggressive accounting of [product] revenue"). Thus, there are no facts from which the Court could conclude or infer that "the accounting was so simple and basic that [D]efendants could not have made an innocent mistake." *In re International Rectifier Corp. Sec. Litig.*, 2008 WL 4555794

at *14 (C.D. Cal. May 23, 2008) (citing *In re Hypercom Corp. Sec. Litig.*, 2006 WL 726791 at *5 (D. Ariz. Mar. 9, 2006)).

Indeed, contrary to Plaintiff's contentions, it does not appear that application of EITF 00-21 is a simple task. *See, e.g., IMAX.*, 587 F. Supp. 2d at 483. In the *IMAX* case, plaintiffs also alleged that the defendants failed to properly apply EITF 00-21. Although the court concluded that plaintiffs had alleged sufficient facts to establish scienter, it noted that "the violations alleged here are far more technical than those in other cases where the defendants faced civil liability for the premature recognition of revenue in contravention of GAAP." *Id.* The apparent complexity of the accounting principle at issue distinguishes this case from cases where defendants misapplied simple accounting principles over long periods of time. *See, e.g., Backe v. Novatel Wireless, Inc.*, 642 F. Supp. 2d 1169, 1185-86 (S.D. Cal. 2009) (defendants alleged to have shipped products prematurely and, in doing so, violated "basic" accounting principles); *Batwin v. Occam Networks, Inc.,* 2008 WL 2676364 at *12 (C.D. Cal. July 1, 2008) (defendants allegedly improperly recognized revenue because resellers did not have ability to pay defendants independent of payment by end-users and terms and conditions did not appropriately transfer title or risk of loss at time of shipment); *In re Microstrategy, Inc. Sec. Litig.*, 115 F. Supp. 2d 620, 637-38 (E.D. Va. 2000) (defendants alleged to have recognized revenue on contracts that had not yet been executed; court noted that "violations of simple rules are obvious, and an inference of scienter becomes more probable as the violations become more obvious").

The Court finds that Plaintiff's allegations regarding Defendants' purported knowledge of Taleo's "core operations" and the purported significance of the GAAP violations do not demonstrate a strong inference of scienter. The Court shall, however, consider each of these allegations in its holistic evaluation of the FAC.

### 2. The Magnitude of the Restatement.

Plaintiff also relies on the alleged magnitude of the Restatement to support its allegations of scienter. It is undisputed that Taleo was required to reduce consulting revenues by $18 million, or 21%, but Plaintiff acknowledges that Taleo's total revenue was overstated by

16

approximately $18,200,000 or only 4%. (FAC ¶ 54.) Plaintiff also alleges that the Restatement impacted Taleo's reported net income and losses. (*Id.* ¶¶ 131, 144, 196, 206.) However, according to Taleo's financial statements, it derived its revenues primarily from application services and consulting services were a secondary form of revenue. (*See, e.g.,* Foung Decl., Ex. 4 (March 16, 2007 Form 10-K at 37)).) Plaintiff alleges that the motive behind Defendants' improper revenue recognition was to create the impression that Taleo "was consistently delivering revenue at levels that exceeded analysts [*sic*] expectations when, in fact, the opposite was true." (FAC ¶¶ 2, 33.) However, in at least some of the quarters subject to the Restatement, Taleo still exceeded consensus estimates. (*Id.* ¶ 34.)

The Court concludes that the allegations regarding the magnitude of Restatement are not so significant that they would support a strong inference of scienter. *See, e.g., In re UTStarcom, Inc. Sec. Litig.*, 617 F. Supp. 2d 964, 975 (N.D. Cal. 2009) (finding that "$400 million in allegedly restated revenues supports an inference of scienter"); *In re Microstrategy*, 115 F. Supp. 2d at 637 (finding allegations premised on magnitude of restatement contributed to strong inference of scienter, where restatement was of such magnitude that it amounted to "night and day difference with regard to" representations of profitability"). The Court shall, however, consider these allegations in its holistic evaluation of the FAC.

### 3. The Prior Weaknesses in Internal Controls.

Plaintiff also supports its allegations of scienter with allegations that Defendants disclosed material weaknesses in Taleo's internal controls and, thereafter, claimed that they had corrected for these deficiencies, claims that apparently were belied by the Restatement. (*See, e.g.,* FAC ¶¶ 65-68, 75, 81, 84.) That is, Plaintiff contends that Defendants' awareness of prior deficiencies suggests that they must have known that they were not recognizing revenue in accordance with the proper interpretation of EITF 00-21, or at least recklessly disregarded that fact. Because, however, the Court concludes that the other allegations in the FAC do not support an inference that Defendants knowingly misapplied EITF 00-21, or were deliberately reckless, the Court concludes that the allegations regarding prior deficiencies, which are unrelated to the manner in which Taleo accounted for its bundled products, do not give rise to a

17

strong inference of scienter. The Court, however, shall consider these allegations in its holistic evaluation of the FAC.

### 4. The Insider Stock Sales.

Plaintiff also attempts to plead scienter by relying on insider stock sales. "Although 'unusual' or 'suspicious' stock sales by corporate insiders may constitute circumstantial evidence of scienter, ... insider trading is suspicious only when it is dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information." *Silicon Graphics*, 183 F.3d at 986 (internal quotations and citations omitted). Thus, courts consider the following factors in determining whether stock sales by inside officers or directors provide sufficient evidence of scienter: "(1) the amount and percentage of shares sold by insiders; (2) the timing of the sales; and (3) whether the sales were consistent with the insider's prior trading history." *Id.*; *see also Ronconi v. Larkin*, 253 F.3d 423, 435 (9th Cir. 2001).

Plaintiff does not allege that Sisodraker sold any stock during the Class Period. Plaintiff alleges that Gregoire and Murray sold 42% and 62% of their respective holdings. Defendants do not dispute the total amount of stock sold, but they contend that Plaintiff understates Gregoire's holdings and overstates Murray's holdings, and that the actual percentages are approximately 38% and 61%. Although these percentages are large, "large numbers do not necessarily create a strong inference of fraud." *In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1093 (9th Cir. 2002). The Court finds that is the case here.

First, as noted Plaintiff's Class Period runs from September 2005 through November 2008. *See, e.g., International Rectifier*, 2008 WL 4555794 at *19. Second, the Court does not find the timing to be suspicious. Although almost 50% of Gregoire's stock sales were made three months before the announcement regarding the Restatement, the bulk of Murray's sales occurred in November 2007. (*See* FAC ¶¶ 227-228.) In addition, Defendants sold their stock pursuant to Rule 10b-5 trading plans. As the Ninth Circuit has noted, that fact may rebut an inference of scienter. *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1067 n.11 (9th Cir. 2008) (citing *In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1427-28 (9th Cir.

18

1    1994)). Plaintiff also does not allege that either Gregoire or Murray amended their 10b-5 plans,
2    and the fact that they may have entered into the plans during the Class Period is not inherently
3    suspicious, given its length. *Compare International Rectifier*, 2008 WL 4555794 at *19
4    (finding allegations of scienter insufficient where class period spanned four years and where
5    there were no allegations that defendant had "actively amended, modified or manipulated his
6    10b-5 trading plans), *with Backe*, 642 F. Supp. 2d at 1185-86 (finding allegations sufficient to
7    allege scienter where plaintiff alleged that defendant had amended 10b-5 plan in order to sell
8    more stock). Accordingly, the Court finds that the allegations regarding the insider stock sales
9    do not give rise to a strong inference of scienter. The Court shall, however, consider these
10   allegations in its holistic analysis of the FAC.

   **5.    Holistic Analysis.**

12   The Court has considered the facts set forth above holistically and concludes that they
13   do not support a cogent and compelling inference of scienter. It is evident from the Court's
14   analysis that Plaintiff does not rely on statements from confidential witnesses, does not rely on
15   internal Taleo documents, does not contend that Defendants violated Taleo's internal
16   accounting policies, and does not allege facts that suggest the Defendants attempted to deceive
17   Taleo's auditors. The lack of such facts negate an inference that Defendants acted intentionally
18   or with deliberate recklessness. *See, e.g., Metzler*, 540 F.3d at 1069 (relying on the fact that
19   auditors did not counsel against revenue recognition practice and fact that there were not facts
20   that defendant admitted practice was improper); *cf. Atlas v. Accredited Home Lenders Holding
21   Co.*, 556 F. Supp. 2d 1142, 1156 (S.D. Cal. 2008) (relying on fact that defendants deviated from
22   its internal underwriting standards to support strong inference of scienter).

23   The scienter inquiry is "inherently comparative." *Tellabs*, 551 U.S. at 324. In this case,
24   without more, the Court cannot conclude that the "malicious inference" Plaintiff urges "is at
25   least as compelling as any opposing innocent inference." *Zucco Partners*, 552 F.3d 991 (citing
26   *Tellabs*, 551 U.S. at 324). Accordingly, Defendants' motion to dismiss is GRANTED.[7]

---

[7]    Because the Court concludes that Plaintiff has not alleged facts sufficient to state a claim under Section 10b-5, Plaintiff's Section 20(a) claim also must be dismissed.

19

**D. Leave to Amend.**

There have only been two iterations of the complaint in this matter, and the Court cannot conclude that, at this point, it would be futile to grant Plaintiff leave to amend. Accordingly, Plaintiff shall be granted leave to amend the FAC to address the deficiencies identified in this Order.

## CONCLUSION

For the foregoing reasons, Defendants motion to dismiss is GRANTED, and Plaintiff is GRANTED leave to amend. Plaintiff shall file its second amended complaint by no later than March 12, 2010, and this matter shall be set down for a case management conference on Friday, May 14, 2010 at 1:30 p.m.

**IT IS SO ORDERED.**

Dated: February 17, 2010

JEFFREY S. WHITE
UNITED STATES DISTRICT JUDGE